

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: § | | |
| BALDEMAR P. RIOS § | CASE NO: 11-30287 | |
| and § | | |
| CECILIA FERNANDEZ PEREZ § | | |
|     Debtor(s) § | | |
| § | CHAPTER 7 | |
| § | | |
| FLSMIDTH KREBS INC. § | | |
|     Plaintiff(s) § | | |
| § | | |
| VS. § | ADVERSARY NO. 12-03129 | |
| § | | |
| BALDEMAR RIOS § | | |
|     Defendant(s) § | | |

## MEMORANDUM OPINION

FLSmidth Krebs Inc. filed this adversary proceeding seeking to deny Baldemar P. Rios a discharge under 11 U.S.C. § 727(a).  FLSmidth alleged that Rios' discharge should be denied because:

- He failed to keep or preserve books, documents, records and papers from which his financial condition or business transactions might be ascertained.  11 U.S.C. § 523(a)(3).

- He failed to explain satisfactorily any loss of assets or deficiency of assets to meet his liabilities.  11 U.S.C. § 523(a)(5).

The evidence overwhelmingly demonstrates that Rios' discharge should be denied for the two reasons set forth in FLSmidth's complaint.

### Background

Rios and his wife filed a joint voluntary chapter 11 petition on January 4, 2011.  Along with the petition, Rios filed some, but not all, of his required schedules.  He listed ownership of a homestead with a value of $1,600,000 and other real estate with a value of $6,500,000.  Secured debts against the real estate totaled $4,800,000.  He also listed $200,000 of cash held at a title

company, a car, and an interest in a company named "Projects & Industrial Products LLC" with an unknown value. No other assets were scheduled.

On February 14, 2011, Rios amended his schedules. The amended schedules added various items of household personal property with unknown values. Notably, Rios included certain other business interests with nominal values and he valued his interest in Projects & Industrial Products at $6,000,000. He also added a second car to his schedules.

On February 15, 2011, Rios again amended his schedules. He added a tract of land in Mexico with a value of $330,000. He also added about $1,700 in cash, placed values on his household items, and added several items of jewelry.

Also on February 15, 2011, Rios filed his Statement of Financial Affairs in which he stated that his gross income in each of 2009 and 2010 was $250,000. On that same date, he filed his Periodic Report Regarding Value, Operations and Profitability for businesses in which he holds a controlling interest. Most notably, Rios claimed that Projects & Industrial Products had a value of $26,000,000. He included a balance sheet for the entity as of December 2010 in which he listed Current Assets of $6,575,088 and Property and Equipment of $1,623,598. Liabilities were listed at only $253,664. The statement was amended on March 3, 2011 to reduce the value estimate from $26,000,000 to $6,000,000.

On April 4, 2011, Rios again amended Schedule B. Although there were a number of amendments, the most notable was a change in the value of Projects & Industrial Products. The value of Rios' interest was raised to $7,000,000.

After a series of discovery and sanctions disputes, Rios was unable to confirm any plan in his chapter 11 bankruptcy case. On December 5, 2011, after a contested hearing, the case was converted to a case under Chapter 7 of the Bankruptcy Code.

This Adversary Proceeding was timely filed on February 23, 2012. Following discovery, a trial was held on March 14, 2013.

## Projects & Industrial Products

FLSmidth's claims against Rios focus on his interest in Projects & Industrial Products. Accordingly, some additional discussion of that entity is appropriate.

Rios was at all times the sole owner of Projects & Industrial Products. It was formed on November 7, 1996. The following information is derived from tax returns admitted at trial:

| Year Ending December 31 | Gross Sales | Total Assets |
|---|---:|---:|
| 2006 | $37,518,695.00 | $12,845,062.00 |
| 2007 | $4,284,353.00 | $5,688,460.00 |
| 2008 | $14,715,536.00 | $13,730,139.00 |
| 2009 | $21,472,081.00 | $21,771,738.00 |
| **TOTAL** | **$77,990,665.00** | |

Projects & Industrial Products maintained its records on an accrual basis. It had substantial accounts receivable and cash. Based on the tax returns and the schedules and documents filed by Rios, the accounts receivable and cash balances varied:

| December 31 | Accounts Receivable | Cash |
|---|---:|---:|
| 2006 | $1,744,450.00 | $209,960.00 |
| 2007 | $2,615,909.00 | $108,991.00 |
| 2008 | $4,878,574.00 | $130,814.00 |
| 2009 | $9,757,148.00 | $261,628.00 |
| 2010 | $6,568,875.00 | $6,213.00 |

It is apparent that Projects & Industrial Products was a substantial, privately held business. It is inconceivable that a business of this magnitude—that maintained its books on an accrual basis and that held very substantial accounts receivable—would have no transactional records. Yet, as set forth in detail below, Rios was unable or unwilling to produce the business's records.

**Legal Standards**

To justify denial of discharge for failure to keep adequate financial records under § 727(a)(3), a plaintiff must show that (i) the debtor failed to keep and preserve financial records; and (ii) this failure prevented the plaintiff from ascertaining the debtor's financial condition. *In re Dennis,* 330 F.3d 696, 703 (5th Cir. 2003). "A debtor's financial records need not contain "full detail," but 'there should be written evidence' of the debtor's financial condition." *Id.* (quoting *In re Goff,* 495 F.2d 199, 201 (5th Cir. 1974).

Once the plaintiff has met its initial burden, the debtor must prove that the inadequacy of the records is "justified under all of the circumstances." *In re Cantu,* 2011 WL 672336 (Bankr. S.D. Tex. 2011).

To justify a denial of discharge for failure to satisfactorily explain a loss of assets, the creditor must present a prima facie case. *In re Reed,* 700 F.2d 986, 993 (5th Cir. 1983). Thereafter, the burden shifts to the debtor to provide a satisfactory explanation. *Id.* The Fifth Circuit explains that:

> [A satisfactory explanation is one that] may mean reasonable, or it may mean that the court, after having heard the excuse, the explanation, has that mental attitude which finds contentment in saying that he believes the explanation-he believes what the bankrupts say with reference to the disappearance or shortage. He is satisfied. He no longer wonders. He is contented.

*Id.*

The plaintiff must meet its burdens by a preponderance of the evidence. *In re Beaubouef,* 966 F.2d 174, 178 (5th Cir. 1992). The factors for a denial of discharge must be strictly construed against the creditor and liberally in favor of the debtor. *In re Laughlin,* 602 F.3d 417, 421 (5th Cir. 2010).

**Affiliated Businesses**

As set forth above, the trial evidence focused on Projects & Industrial Products. The Court must determine whether it is appropriate to consider failures arising out of a debtor's wholly owned businesses when determining whether adequate records were maintained and whether there has been a satisfactory explanation of loss.

Individuals often structure their business affairs through wholly or partially owned entities. In this case, Rios utilized corporations, LLCs or other legitimate business structures to conduct his business affairs. As set forth on his schedules, substantially all of his net worth was in his wholly owned business enterprises.

It borders on frivolity to suggest that a debtor could fail to maintain records or explain losses within his wholly owned businesses, but not be subject to a denial of discharge under § 727 of the Bankruptcy Code.

The principal Circuit Court opinion to address this issue is *Union Planters Bank N.A. v. Connors,* 283 F.3d 896, 900 (7th Cir. 2002). That opinion holds that an appropriate § 727 inquiry extends into a Debtor's business transactions. The United States Bankruptcy Court for the Northern District of Texas applied *Union Planters* and held that transactions undertaken by an affiliated entity are an appropriate area for a § 727 inquiry. *In re Womble,* 289 B.R. 836 (Bankr. N.D. Tex. 2003), *aff'd* 108 Fed. Appx. 993 (5th Cir. 2004). In its affirmance, the Fifth Circuit cited *Union Planters* with approval. The transactions undertaken by Rios' affiliated company (Projects & Industrial Products) are an appropriate area for a § 727 inquiry.

**Rios as Sophisticated Business Owner**

The level of required record keeping, and the ability to satisfactorily explain asset dispositions, are case specific. "The level of the debtor's sophistication and extent of his

business activities will bear on the adequacy of his record keeping." *In re Womble,* 108 Fed. Appx. 993 (5th Cir. 2004), quoting *In re Goff*, 495 F.2d 199, 201-02 (5th Cir.1974).

The Court should examine Rios' education, experience, and sophistication. It should look at the volume and complexity of his business and any other circumstances that should be considered in the interest of justice. *In re Womble,* 108 Fed. Appx. 993 (5th Cir. 2004).

Rios was, by all measures, a sophisticated businessman. He holds a bachelor's degree in chemical engineering from a university in Mexico and a master's degree in chemical engineering from San Jose State University. Mr. Rios also took several finance and accounting courses at Mission College in California.

He ran several businesses. In the four years preceding the filing of this bankruptcy case, Projects & Industrial Products had cumulative sales exceeding $75,000,000. The business maintained its records on an accrual basis. Millions of dollars of accounts receivable were routinely carried on the books. When Rios filed bankruptcy, he valued the business enterprise at as much as $26,000,000, a value that he later reduced to $6,000,000.

By any standard, the Court would expect there to be meaningful business records and a satisfactory explanation of losses of assets.

### Records

Rios failed to keep and preserve financial records on Projects & Industrial Products. This failure prevented FLSmidth from ascertaining the Rios' financial condition.

The financial records presented by Rios were minimal. They included annual tax returns, a December 31, 2010 financial statement, and some bank statements. The limited bank statements that were produced were a set of bank statements from Chase for the period of May to

December 2010 and a set of bank statements from IBC for the period of November 2008 to October 2010.

Rios failed to produce general ledgers, check rosters, income statements, accounts receivable registers, and other recorded financial information pertaining to Projects & Industrial Products. These are the types of records that any business would maintain if it had sales volumes and assets of the magnitude represented by Projects & Industrial Products.

FLSmidth satisfied its burden of proof when it proved the absence of these records. Without any meaningful accounting records, the inability to understand Rios' financial condition was patent.

Rios did not make any real effort to explain the absence of the records. At trial, Rios was also unable to explain a loss of assets by Projects & Industrial Products. The asset losses would have been understandable (for whatever reason they occurred) had adequate financial records been maintained. Their absence led to an inability to ascertain Rios' financial condition.

Rios' discharge will be denied for his failure to maintain these records, a failure that led to an inability to ascertain Rios' financial condition. *See* 11 U.S.C. § 723(a)(3).

## Asset Losses

As set forth above, Rios claimed that his interest in Projects & Industrial Products was worth between $6,000,000 and $26,000,000. These claims were made when Rios was attempting to reorganize through chapter 11. After his case was converted to chapter 7, there was no value recovered from Projects & Industrial Products.

The various financial statements, and Rios' bankruptcy schedules, reflected substantial assets as of the petition date. These include a $200,000 escrow deposit, and over $6,500,000 in accounts receivable.

When asked to explain the loss of assets, Rios gave nearly incomprehensible explanations. Here is an excerpt of one of his explanations given at trial as to why he initially listed the value at $26,000,000 and then listed it at $6,000,000:

> **The Court:** When you look at Exhibit number 2, it was filed on February 15. And then Exhibit number 3 was filed on March 3rd, so 18 days later. What events occurred that caused the $20,000,000 drop over 18 days?
>
> **Mr. Rios:** Yeah because, uh one thing that happened also that, you know ah, you know some of the places where we have some operations, we have some . . . companies have some debts, so equipment and um equipment for example and um so . . . the companies, so the subcontractors, that we owed the money, they just stop you know or didn't pay, you know, for example, you know, one of the creditor, I mean one of the subcontractors put a lien, and then you know, put a lien on the company, and then they went with the final customer that was paying us . . .
>
> **The Court:** And when did that occur?
>
> **Mr. Rios:** It occurred about probably, one of this, during this month, I don't know exactly which date. But that's what happened.
>
> **The Court:** I want to back up, so just 18 days, what happened during that 18 day period to cause the $20,000,000 drop in value?
>
> **Mr. Rios:** Yes, well you know, like I say, also, also trying to survive on the company. You know, we have equipment, the equipment, that you know, some of the companies that were owed money, also they dock equipment, and they dock, in this case that what's happened. They dock, they asked the customer to pay directly, and that's what happened. And also, some of the equipment that have with more value was really less value, or might have been the value we say, but when you try to sell or you want to pay with equipment, then, they don't take it as the same value that you told.
>
> **The Court:** I don't think you are hearing my question, so I want you to listen more carefully. During the 18 day period, I don't want to know what might have happened, what could have happened, or what sometimes occurs with equipment. I want to know what occurred during those 18 days that caused the $20,000,000 drop.

>**Mr. Rios:**   Well, you know, our assets were probably overestimated, and also we lost equipment, we lost assets, that probably were not, were not much of that value.  Probably our evaluation of our assets was incorrect.

Rios' own attorney asked what he apparently hoped were rehabilitative questions on the loss of assets.  Here is that excerpt from Rios' testimony:

>**Debtor's Attorney:**  …How much accounts receivable was due to the company?
>
>**Mr. Rios:**   Yeah, you made me more conscious, you made me to be more conscious about about that and then you explained to me you know basically I mean meaning my view at that time about when you asked me that was my view of the universe when you explained to me consciously you know I say you know I think you know the value might not be that much you know.  That's what I came to.
>
>**Debtor's Attorney:**  Let's get back to an important question the Judge asked about.  Ok.  The questions that Mr. Yanochek addressed to you assumed something like the following:  "You owned $5 million of Exxon stock.  You owned $2 million of real property in Mexico and Bolivia and the United States and you had $100,000 of cash in the Bank.  Move forward 4 months and you report "I own 1 share of Exxon stock".  I shouldn't have put that way.  "I owned $1.00 of Exxon stock.  And, I own no real property.  Okay.  Something happened between day 1 and day 2 and that was that the Exxon stock lost value and you somehow disposed of the property and so the asset changed.
>
>**FLSmidth's attorney:**  Objection.  [DETAILS OMITTED]
>
>**Court:**   Overruled.
>
>**Debtor's Attorney:**  So please listen carefully to this question.  What happened to the assets between the times that you said P&IP was worth 26 million dollars and P&IP was worth 6 million dollars?
>
>**Mr. Rios:** Well, you know. The value, I mean the assets were reducing value.

**Debtor's Attorney:**  They were reduced in value in what way?  In your head, in your accounting, in the market place?  In what way did the value go down?

**Mr. Rios:**  By third factors, by the market, no no, not because I did.

**Debtor's Attorney:**  Did the assets change Mr. Rios?

**Mr. Rios:**  What do you mean they changed?  I mean the value or the asset changed?

**Debtor's Attorney:**  Mr. Rios, I cannot ask in a different way.

**Debtor's Attorney:**  Did your knowledge change or did the assets change?

**Mr. Rios:**  Well, I think, I think my knowledge of the things, my knowledge of the things changed, you know.

As set forth above, the Court must be satisfied with the explanation of the loss of assets.  The Court must determine that Rios' explanation left the Court "content" as to what occurred, without continued questions as to the loss of assets.  *In re Reed,* 700 F.2d 986, 993 (5th Cir. 1983).  In this case, Rios' explanations failed to provide any meaningful explanation for the loss of assets.  Rather than providing sufficient information to allow the Court to determine the nature of the loss of assets, Rios has provided no meaningful explanation.

Rios' discharge will be denied for his failure to satisfactorily explain the loss of assets.  11 U.S.C. § 723(a)(5).

## Conclusion

Baldemar P. Rios should not receive a discharge.  A separate judgment will be issued.

SIGNED **July 25, 2013.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE